**NOT FOR PUBLICATION**                                              [31,35]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                        :
LAWRENCE ROMANO,                        :
<u>PRO</u> <u>SE</u>                                :
                                        :
            Plaintiff,                  :
                                        :
      v.                                :      Civil No. 1:04-cv-4346(FLW)
                                        :
DEVON BROWN,                            :
COMMISSIONER OF THE NEW                 :              **OPINION**
JERSEY DEPARTMENT OF                    :
CORRECTIONS                             :
CORRECTIONAL MEDICAL                    :
SERVICES, INC.,                         :
                                        :
            Defendants,                 :
_____        :


<u>**WOLFSON**</u><u>, District Judge</u>

        Presently before the Court are two motions relating to the Complaint of Plaintiff, <u>pro</u> <u>se</u>,

Lawrence Romano, a prisoner currently confined at South Woods State Prison ("SWSP") in

Bridgeton, NJ.  Specifically, Plaintiff alleges that Defendant Devon Brown, the former

Commissioner of the New Jersey Department of Corrections ("NJDOC"), and Correctional

Medical Services ("CMS") violated his Eighth Amendment rights under 42 U.S.C. § 1983 by

failing to provide him with adequate medical treatment, counseling, and testing for Hepatitis C

("HCV").  Additionally, Plaintiff asserts state law claims for negligence, medical malpractice,

and intentional and negligent infliction of emotional distress against CMS Defendants.  In response,  Defendants Brown and CMS, including individual Defendants, Louis Tripol, William Andrade, James J. Neal, M.D., James Ruman, R.N., Rock Welch, Abu Ahsan, M.D (collectively known as "CMS Defendants")  filed individual motions for summary judgment pursuant to Fed. R. Civ. P. (56)(c) relating to Plaintiff's constitutional and state common law claims.

 For the reasons set forth below, Defendants' motions for summary judgment are granted.


I. **BACKGROUND**

 Plaintiff is an inmate who has been in the custody of the NJDOC since October 1995. See Plaintiff's Complaint ("Compl.") at ¶ 1.  Currently, Plaintiff is incarcerated at SWSP in Bridgeton, New Jersey.  Id.  Upon incarceration, on October 31, 1995, Plaintiff received a medical exam.[1]  Subsequently, the prison medical staff created a medical record for Plaintiff and noted that Plaintiff reported using numerous illegal drugs for eleven years prior to his incarceration.  See Affidavit of Kerri E. Chewning Esq., Ex. C, Medical Records of Lawrence Romano ("Chewning Aff., Ex. C").  Additionally, Plaintiff tested negative for Hepatitis A ("HAV"), Hepatitis B ("HBV"), and syphilis on May 16, 1996.  Id.  Thereafter, on February 13, 2001, Plaintiff was diagnosed with Adjustment Disorder with Anxiety and Depression.  Affidavit of Lionel Anicette at ¶ 10. ("Anicette Aff.").  Plaintiff was prescribed Klonopin on September 6, 2001, and this medication was continued through October 2001.  Id.

 On August 30, 2002, Plaintiff submitted a Health Services Request Form requesting

---

[1] The Court notes CMS Defendants have provided Plaintiff's extensive medical records. Many of these records detail Plaintiff's  numerous health issues, treatments, and medications that are not related to his HCV infection and therefore will not be discussed in this opinion.

testing for HCV.   Chewning Aff., Ex. C.  According to CMS Defendants, Plaintiff was not granted HCV testing after his initial request because CMS personnel determined that Plaintiff was not at risk for HCV.  Anicette Aff. at ¶ 11.  Thereafter, Plaintiff filed two subsequent Inmate Request Forms asking for HCV testing on September 12 and 18, 2002.  Chewning Aff., Ex. C. On October 17, 2002, Plaintiff made an in-person request for HCV testing during a sick call visit. Id.  At that time, Plaintiff communicated his past intravenous drug use to CMS personnel.  Id. As a result, CMS personnel were prepared to test Plaintiff for HCV on October 17, 2002, but Plaintiff left for lunch instead of waiting to receive the test.  CMS personnel rescheduled testing for the following day, October 18, 2002, Plaintiff did not show up for his appointment.  Id.

On November 23, 2002, Plaintiff filed a Health Services Request Form requesting HCV testing and medication renewal.  Id.  Plaintiff made another in-person request for HCV testing during a sick call visit on November 29, 2002.  Id.  At that time, Plaintiff communicated a twenty-two year history of intravenous drug use to CMS personnel.  Id.  CMS personnel scheduled Plaintiff for HCV testing on December 3, 2002.  Id.  As a result, Plaintiff tested positive for HCV and was placed on the HCV chronic care list on December 11, 2002.  Id.

Plaintiff's medical records indicate that on December 11, 2002, Plaintiff underwent numerous tests relating to his HCV infection to determine possible courses of drug therapy.  Id. On April 9, 2003, Plaintiff received information concerning HCV, including possible side effects, expected outcomes, and the length of therapy.  Id.  Plaintiff failed to show up for scheduled blood work on May 5, 2003.  Id.  On June 3, 2003, Plaintiff's HCV genotype was reported as 1b and he was referred to a gastroenterologist on June 13, 2003 and July 7, 2003.  Id. Plaintiff refused a scheduled gastroenterologist evaluation scheduled for July 30, 2003.  Id.

3

During a sick call visit on December 23, 2003, Plaintiff told CMS personnel that he did not attend his gastroenterologist evaluation because of a conflicting appointment with an attorney. Id.  In addition,  Plaintiff indicated his desire to be evaluated for a comprehensive profile to check liver enzymes.  Id.

On January 2, 2004, Plaintiff refused laboratory testing and blood work.  Id.  Plaintiff failed to show up to a scheduled sick call appointment on February 23, 2004.  Id.  On February 28, 2004, Plaintiff was given an overview of HCV, information on the prevention and spread of HCV, and documentation on living with HCV.  Id.  On June 6, 2004, Plaintiff underwent an EKG that revealed that he suffered from a ventricular abnormality.  Id.  Plaintiff also underwent psychiatric evaluations on September 17, 2004 and October 18, 2004.  Id.  The psychologist who performed the evaluation noted Plaintiff's use of illegal drugs, alcohol abuse, and misuse of prescribed medication.  Id.  A liver biopsy was performed on November 15, 2004 to assess the condition of Plaintiff's liver.  Id.  The biopsy results showed chronic hepatitis with minimal to mild activity, grade 1-2, portal and focal early periportal fibrosis, and diffuse steatosis.  Id.

Plaintiff was referred to Cooper University Hospital's Infectious Disease group for drug therapy.  Id.  On January 6, 2005, Plaintiff consented to drug therapy consisting of a daily dose of PEG-interferon and Ribavirin.  Id.  Plaintiff's drug therapy continued through March 18, 2005, when he suffered a heart attack which required that his medication be ceased.  Id.  After the heart attack, CMS personnel at SWSP closely monitored Plaintiff's HCV and overall medical condition.  See generally Id.  Plaintiff was a "no show" for two scheduled appointments on both April 22, 2005 and April 27, 2005.  Id.  According to CMS Defendants, Plaintiff underwent laboratory testing on April 28, 2005, which revealed that his AST was almost within normal

range at 42 and ALT was only slightly elevated at 64.  Anicette Aff. at ¶ 29.  Currently, according

to Defendant, Plaintiff is not eligible for HCV drug therapy because of his heart attack and active

psychiatric illness, although, he continues to be monitored and treated by CMS personnel at

SWSP.  Id. at ¶ 31.

On September 7, 2004, Plaintiff filed a pro se Complaint together with an application to

proceed in forma pauperis ("IFP"), without prepayment of fees, pursuant to 28 U.S.C. § 1915.

On April 11, 2005, the Court granted Plaintiff's IFP application.  On May 13, 2005, Plaintiff

filed an application for Pro Bono Counsel[2].  On March 23, 2006, CMS Defendants filed a Motion

for Summary Judgment, and on April 10, 2006, Defendant Brown filed a Motion for Summary

Judgment.  Subsequently, on April 20, 2006, Plaintiff filed for an extension of time to respond to

Defendants' motions, which was granted by the Honorable United States District Judge Stanley

R. Chesler on April 25, 2006[3].  Thereafter, on May 15, 2006, Plaintiff wrote a letter to the Court

requesting a second thirty-day extension to submit an Opposition Brief.  On May 22, 2006, Judge

Chesler granted Plaintiff's second request for extension of time.  The second extension has

expired, and, as of August 14, 2006, Plaintiff has not filed any opposition in the instant matter.


II.     DISCUSSION

A.      Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[2]The Court notes that Plaintiff's application for Pro Bono Counsel has not yet been considered and will be decided in the instant opinion.
    [3]This case, including all its pending motions, were transferred to me on July 10, 2006, from the Honorable Judge Chesler.

law." <u>Fed. R. Civ. P.</u> (56)(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material only if it might affect the outcome of the suit under the applicable rule of law. <u>Id</u>.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. <u>Id</u>.  The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. <u>Celotex</u>, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Fed. R. Civ. P.</u> 56(e).  To do so, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

**B.      Application for Pro Bono Counsel pursuant to 28 U.S.C. § 1915(e)(1)**

On May 13, 2005, Plaintiff petitioned this Court for appointment of counsel. Pursuant to 28 U.S.C. §1915(e), a court may request an attorney to represent an indigent plaintiff in a civil action.  Section 1915 provides in relevant part:

(1) The court may request an attorney to represent any person unable to afford counsel.

(2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-(A) the allegation of poverty is untrue; or (B) the action or appeal-(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. §1915(e).

However, the appointment of counsel under §1915(e) is a privilege, not a statutory or constitutional right, Purnell v. Lopez, 903 F. Supp. 863, 864 (E.D. Pa. 1995), and within a court's sole discretion.  Parham v. Johnson, 126 F.3d 454, 457 (3d Cir. 1997); see also Tabron v. Grace, 6 F.3d 147, 155 (3d Cir. 1993), cert. denied, 510 U.S. 1196 (1994).  Appointment of counsel may be made at any point during the litigation or by a court sua sponte. Tabron, 6 F.3d at 156.  In exercising its discretion under §1915(e), a court is required, as a preliminary matter, to determine whether the claim has "some merit in fact and law." Parham, 126 F.3d at 457.

If a court finds that an action is not frivolous and has merit, it must consider the following factors to determine whether appointment of counsel is appropriate:

> (1) plaintiff's ability to present his or her own case;
> (2) the complexity of the legal issues;
> (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation;
> (4) the amount a case is likely to turn on credibility determinations;
> (5) whether the case will require the testimony of expert witnesses, and;
> (6) whether the plaintiff can attain and afford counsel on his or her own behalf.

Tabron, 6 F.3d at 156-157.  This list is not exhaustive, nor is any single factor determinative. Id. at 157.  The factors ensure that courts will only appoint counsel in non-frivolous matters. Parham, 126 F.3d at 461.

The first factor for consideration is a plaintiff's ability to present his own case.  A court should consider a plaintiff's literacy, education, and prior work and litigation experience. Tabron, 6 F.3d at 156.  A plaintiff's ability to understand English is also relevant. Id.  If a plaintiff is incarcerated, the restraints placed upon him by his confinement should also be considered. Id.

7

With regard to the second factor, a court should be more inclined to appoint counsel when the legal issues are complex. Id.  Where the law is unclear, it will best serve the ends of justice to have both sides of a legal issue presented by those trained in legal analysis. Id.  With respect to the third factor, the degree to which factual investigation will be necessary and a plaintiff's ability to pursue such an investigation, a court may consider the extent to which prisoners suffering confinement face problems in pursuing their claims. Tabron, 6 F.3d at 156.  Consideration of the fourth factor, whether a case is likely to turn on credibility determinations, should focus on whether the case is largely based on the word of one side against the world of the other side. Parham, 126 F.3d at 460.  Regarding the fifth factor, appointment of counsel may be warranted where the case will require testimony from expert witnesses. Tabron, 6 F.3d at 156.  Finally, the proper consideration of the sixth and last factor, a plaintiff's ability to pay for counsel on his own behalf, is largely self evident in the case of an indigent, incarcerated plaintiff. Parham, 126 F.3d at 461.

Here, although Plaintiff's case has "arguable merit in fact and law," Tabron, 6 F.3d at 155, I find that appointment of counsel is not appropriate based on the factors identified above. First, Plaintiff has not alleged that he has a limited understanding of and or ability with the English language.  Indeed, Plaintiff has filed numerous papers and letters with this Court that underscore Plaintiff's understanding of and ability to communicate in English.  Moreover, in his Application for Counsel, Plaintiff admits that the legal issues in this matter are not complex.  Pl's Application for Pro Bono Counsel at ¶ 2.   The substantive motions in this case involve long-standing and well-established law under 42 U.S.C. § 1983 including Eleventh Amendment Immunity and an Eight Amendment claim of Deliberate Indifference to Medical Need.  Further,

8

this case is not factually complex and Plaintiff has not demonstrated the need for extensive discovery above and beyond his medical files.  Indeed, the Court notes that Plaintiff's medical files are in the record, and thus, available to him.  Finally, despite Plaintiff's alleged inability to afford counsel, that factor alone does not warrant the appointment of counsel. Accordingly, I conclude that appointment of counsel is not appropriate, and Plaintiff's request for such appointment is denied.

**C.     Plaintiff's 42 U.S.C. § 1983 Claim Against Devon Brown**

Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that Defendant Brown violated his Eighth Amendment guarantee to be free from cruel and unusual punishment.  Specifically, Plaintiff claims that in his official capacity as Commissioner of the New Jersey DOC, Brown was deliberately indifferent to Plaintiff's HCV.

In response, Brown initially contends that Plaintiff's 1983 claim should be dismissed because the Eleventh Amendment bars civil suits against persons in their official capacities.  The Eleventh Amendment establishes that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by citizens or subjects of any foreign state."  U.S. Const. Amend. XI.  Thus, without consent or a waiver of immunity, a federal court cannot exercise jurisdiction over claims brought by an individual against a state or a state agency. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99 (1984).  Moreover, the Eleventh Amendment bars suit even when the state is not named a party to the action as long as "the state is the real, substantial party in interest." Bennett v. City of Atlantic City, 288 F. Supp. 2d 675,

9

679 (D.N.J. 2003).  Under this framework, state agencies and officials acting in their official capacities are routinely afforded Eleventh Amendment immunity.  Buckhannon Bd. & Care Home, Inc., v. W. Va. Dept. of Health and Human Res., 532 U.S. 598, 609 n. 10 ("States and state officers acting in their official capacity are immune from suits for damages in federal court."); Will v. Mich. Dept. of State Police, 491 U.S. 58, 70-71 (1989); Fitchik v. N.J. Transit Rail Operations, Inc,, 873 F.2d 655, 658 (3d Cir. 1989).

To determine if a claim is barred by sovereign immunity, a court must initially determine if the state is the real party in interest.  Under Fitchik, a court must consider: (1) whether payment of a judgment resulting from the suit would come from the state treasury; (2) the status of the entity under state law; and (3) the entity's degree of autonomy.  See 873 F.2d at 659.  However, the Third Circuit has expressly held that the dispositive question in determining Eleventh Amendment immunity is "whether any judgment would be paid from the state treasury." Carter v. City of Philadelphia, 181 F.3d 339, 348 (3d Cir. 1999) (citing Bolden v. Southeastern Pennsylvania Transportation Authority, 953 F.2d 807, 816 (3d Cir. 1991)).  Moreover, defendants bear the burden of proving that they are entitled to sovereign immunity.  See Chisolm v. McManimon, 275 F. 3d 315, 323 (3d Cir. 2001).  In addition, the Supreme Court  has held that a § 1983 claim seeking damages against a state official in his official capacity must be dismissed because the real party at interest is the state and the state is not a "person" within the meaning of 42 U.S.C. § 1983.  Will v. Michigan Department of State Police, 491 U.S. 58, 70-71 (1989).

According to N.J. Stat. Ann. § 30:1 B-2, the NJDOC is a principal department of the state's executive branch.  The Commissioner of the NJDOC is "appointed by the Governor, with the advice and consent of the Senate, and shall serve at the pleasure of the Governor. . ." N.J.

Stat. Ann. § 30:1 B-4.  Thus, courts have consistently extended sovereign immunity to NJDOC

officials in § 1983 actions.  See, e.g., Snyder v. Baumecker, 708 F.Supp. 1451, 1455-56 (D.N.J.

1989) (finding NJDOC is "the alter ego of the State of New Jersey, and as such, is immune from

suit under the [E]leventh [A]mendment"); Jordan v. NJDOC, 881 F.Supp. 947, 952 (D.N.J.

1995) (finding Eleventh Amendment sovereign immunity extends to NJDOC).

In the instant matter, Plaintiff's Complaint named Brown as a defendant in his official

capacity as Commissioner of the NJDOC, Brown's Br. at 5, and alleged that Brown was

deliberately indifferent to his HCV infection.  Compl. at ¶ 16.  As noted above, this court has

consistently extended sovereign immunity to NJDOC officials.  Thus, to the extent that Plaintiff

seeks damages against Brown in his official capacity as Commissioner of the NJDOC, those

portions of his claim are barred by the Eleventh Amendment.

However, although Plaintiff cannot sustain a § 1983 claim against Brown in his official

capacity, he may be able to pursue a § 1983 claim against Brown for actions taken in his

individual capacity.[4]  A plaintiff can seek "to impose personal liability upon a government

---

[4]      Courts are obligated to construe pro se pleadings liberally.  Haines v. Kerner, 404 U.S.
519, 520 (1972); Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir. 2004) ("[The Court will] apply
the applicable law, irrespective of whether the pro se litigant has mentioned it by name.").  In the
present case, it is unclear from Plaintiff's Complaint whether he intended to sue Brown in both
his official capacity and in his individual capacity.  Plaintiff's Complaint names Brown as a
defendant and identifies him by his official title in the Complaint.  See Compl. at ¶ 15.  Although
Plaintiff does not specifically allege that he is suing Brown in his individual capacity, Plaintiff is
seeking punitive damages from Brown.  These kinds of damages cannot be recovered against
officials in an official capacity suit.  See Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988).
Further, the Court notes that in his Brief in Support of his Motion for Summary Judgment,
Brown argues that summary judgment is appropriate on both official capacity and individual
capacity claims against him.  Df.'s Br. at pg. 6.  Thus, the Court understands Plaintiff to be suing
Brown in his individual capacity as well as in his official capacity.  See id.
         In addition, the Court notes that a majority of federal courts have employed a "course of
proceedings" test to determine whether a plaintiff can proceed with both official and individual
capacity suits pursuant to 42 U.S.C. § 1983 when it is unclear what Plaintiff's intentions were
from the complaint.  See e.g., Powell v. Alexander, 391 F.3 1, 22 (1st Cir. 2004) ("We now join

official for action he takes under color of state law" in an individual capacity suit.  Kentucky v.

Graham, 473 U.S. 159, 165 (1985).  To sustain a § 1983 claim against an official in his

individual capacity, a plaintiff must allege that he directly or indirectly participated in the events

surrounding the claim.  See e.g., Brown v. Sielaff, 474 F.2d 826, 827 (3d Cir. 1973) (finding "no

claim existed for which relief may be granted" where a prisoner plaintiff failed to allege

defendant's direct participation in causing his injury); Riley v. Brown, 2006 WL 842737, *9

(D.N.J. 2006) (finding plaintiff's allegations that NJDOC officials were active in creating prison

safety guidelines and knowledgeable of their implementation were sufficient to state a claim

pursuant to 42 U.S.C.§ 1983).  Indeed, it is well established that a plaintiff cannot maintain §

1983 claims against individual defendants under a theory of respondeat superior.[5]  See e.g., Riley

v. Brown, 2006 WL 842437, *7 (D.N.J. 2006) (holding that prison supervisors may not be held

liable under a respondeat superior theory of liability in § 1983 claims); Kelley v. Edison

Township, 377 F. Supp. 2d 478, 485 (D.N.J. 2005) (dismissing plaintiff's suit in which he

alleged municipality was liable for actions of its police officers pursuant to a § 1983 claim).

---

the multitude of circuits employing the 'course of proceedings' test, which appropriately
balances a defendant's need for fair notice of potential personal liability against a plaintiff's need
for the flexibility to develop his or her case as the unfolding events of litigant warrant, In doing
so, we decline to adopt a formalistic 'bright-line' test requiring a plaintiff to use specific words
in his or her complaint to pursue a particular defendant in a particular capacity."); Biggs v.
Meadows, 66 F.3d 56, 59-60 (4th Cir. 1995) (holding it will adopt view of the Second, Third,
Fifth, Seventh, Ninth, Tenth and Eleventh Circuits that plaintiff does not need to expressly plead
the capacity in which he is suing a defendant in a § 1983 claim). Moreover, the Third Circuit has
generously construed pleadings where the plaintiff sues for damages to constitute a §1983 claim
against a defendant in his individual capacity.  See Ellis v. Horn, 2002 WL 1225272, *1 (3d Cir.
2002); Brandt v. Monroe, 2006 WL 1468394 (D.N.J. 2006). For all these reasons, the Court will
construe Plaintiff's Complaint to allege both official and individual claims against Brown.

[5]        "Respondeat superior and vicarious liability are the theories under which courts 'impose
liability vicariously . . .  solely on the basis of the evidence of an employer-employee relationship
with a tortfeasor.'" Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir.
2003) (quoting Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658, 691 (1978)).

12

Consequently, liability under § 1983 only adheres where the defendant was personally involved in the alleged wrongs. Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir.1988).  Further, although a defendant may be liable where he "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm," Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir.1989), "[a]llegations of participation or actual knowledge and acquiescence. . .must be made with appropriate particularity." Rode, 845 F.2d at 1208 (citations omitted). Accordingly, where a plaintiff in a civil rights suit does not allege that a defendant "participated directly or indirectly in the circumstances constituting [his] claim, . . .no claim existed for which relief may be granted." Brown v. Sielaff, 474 F.2d 826, 827 (3d Cir.1973) (dismissing state prisoner's suit against the Commissioner of Correction for failure to state a claim under § 1983).  Thus, without some personal involvement on the part of a government official, an official cannot be liable for the actions of a subordinate.  Snyder v. Baumecker, 708 F.Supp. 1451, 1458 (3d Cir. 1989) (citing Goode v. Rizzo, 506 F.2d 542, 550 (3d Cir. 1974) rev'd on other grounds, 423 U.S. 362 (1976)).  Finally, unlike an official capacity suit, a plaintiff may also seek punitive damages against an official in his individual capacity.  See Smith v. Wade, 461 U.S. 30 (1983); West v. Keve, 571 F.2d 158, 163 (3d Cir. 1978).

In the instant matter, Plaintiff has not alleged that Brown participated, directly or indirectly, in any events surrounding his treatment, testing or medical care.  Indeed, with regard to the alleged violations by Brown in his individual capacity, the Complaint is devoid of any allegation stating direct or personal involvement.  Moreover, in Sample v. Diecks, the Third Circuit held that in order for a plaintiff to sustain an Eighth Amendment claim against prison

supervisor, he must identify a specific policy or practice that the prison official failed to enforce and show that: (1) the existing policy or practice created an unreasonable risk of the injury; (2) the supervisor was aware that there was an unreasonable risk created; (3) the supervisor was indifferent to that risk; and (4) the injury result from the policy.  885 F.2d 1099, 1110 (3d Cir. 1989).  Here, Plaintiff does not allege that Brown created any policies or customs that were used by CMS in testing or treating prisoners for HCV.  In addition, Plaintiff has not identified any specific policy or custom that violates his Eighth Amendment rights or a CMS policy regarding HCV testing or treatment.   In the absence of any evidence to the contrary, there is no factual dispute as to whether Brown directly or indirectly participated in the events surrounding Plaintiff's claim.  Accordingly, Brown's motion for summary judgment is granted.

### D.    Plaintiff's 42 U.S.C. § 1983 claim against CMS Defendants

In addition to his claims against Brown, Plaintiff sets forth a § 1983 Complaint against the CMS Defendants.  Specifically, Plaintiff contends that the CMS Defendants failed to properly screen, diagnose, and treat him for HCV in violation of the Eighth Amendment.   Section 1983 provides a private cause of action against any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983.  The statute, in and of itself, is not a source of substantive rights but provides " a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989).  In order to assert a § 1983 claim, a plaintiff must allege that the defendant "acting under color of State law" deprived him of a right secured by the Constitution and laws of the United States.[6]   West, 487 U.S. at 48; Natale, 318 F.3d at 580-81.

It is well established that prisoners can assert Eighth Amendment claims pursuant to § 1983 alleging inadequate medical care.  See Helling v. McKinney, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").  However, "[f]ailure to provide medical care to a person in custody can rise to the level of a constitutional violation [of the Eighth Amendment] under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." Groman v. Township of Manalapan, 47 F.3d 628, 636-37 (3d Cir. 1995).  Essentially, the "deliberate indifference" standard is a two-prong test, requiring a demonstration that: (1) the prisoner's medical needs are serious; and (2) the

---

[5]    Importantly, the Court notes that CMS Defendants do not argue they were not acting under the color of state law when they  provided medical care to Plaintiff.  For the purposes of a § 1983 claim, the Supreme Court has recognized physicians under contract with the state to provide medical services to prisoners are "state actors." See West v. Atkins, 487 U.S. 42, 54 (1988).

defendants were deliberately indifferent to those needs.  Estelle v. Gamble, 429 U.S. 97 (1976); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).  The Third Circuit has determined a "serious medical need" is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Lanzaro, 834 F.2d at 347 (quoting Pace v. Fauver, 478 F.Supp. 456, 458 (D.N.J. 1979)).  The Third Circuit has also established that when a delay in or denial of requested medical treatment causes an inmate to suffer a life long handicap or permanent loss, the medical need is serious.  Id.

However, a misdiagnosis or mere disagreement with the form of treatment does not rise to the level of a constitutional violation.  Estelle, 429 U.S. at 107.   Moreover, medical malpractice does not become an Eighth Amendment violation merely because the victim is a prisoner.  Id. at 106.  A plaintiff can establish that an official was deliberately indifferent to his medical condition in a variety of ways, including where an official "(1) kn[ew] of prisoner's need for medical treatment but intentionally refuse[d] to provide it; (2) delay[ed] necessary medical treatment based on a non-medical reason; (3) prevent[ed] a prisoner from receiving needed or recommended medical treatments."  Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993) (quoting Lanzaro, 834 F.2d at 346-47)).

Further, courts generally grant prison physicians significant latitude in determining the course of medical treatment as long as it is based on "sound professional judgment." Christy v. Robinson, 216 F.Supp. 2d 398, 413 (D.N.J. 2002) (citing Inmates of Allegheny Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)).  Thus, although  a court will generally not find deliberate

16

indifference where a plaintiff was provided with some form of medical care,[7] liability is not precluded where care was not based on sound medical judgment.  See Christy, 216 F.Supp at 413.  Indeed, the Third Circuit has found a constitutional violation where the treatment pursued was based on non-medical reasons.  See White v. Napoleon, 879 F.2d 103, 109 (3d Cir. 1990). For example, in White, the Third Circuit found deliberate indifference where a doctor used certain medication and treatments for the purposes of intentionally inflicting pain on the prisoner. Id.

In the instant matter, CMS Defendants do not argue that Plaintiff's HCV infection does not constitute a serious medical need.  Thus, the Court finds that the first prong of the deliberate indifference test is met and the dispositive question is whether CMS Defendants acted with deliberate indifference to Plaintiff's medical condition.  Accordingly, Plaintiff alleges that he repeatedly requested HCV testing over the course of several months and that these requests went unheeded. Compl. at ¶¶ 26-26B.  In addition, Plaintiff contends that he exhibited HCV risk factors which CMS Defendants failed to recognize in evaluating him for HCV testing.  Id. at ¶ 28.  Further, after he was tested and received a positive test result confirming he had HCV, Plaintiff claims that he was not educated about treatment or provided with the appropriate treatment options.  Id. at ¶ 29.  Finally, Plaintiff alleges that CMS Defendants unnecessarily postponed testing the condition of his liver and any treatment for liver disease.  Id. at ¶ 30.

---

[7]    See, e.g., Christy, 216 F.Supp. 2d at 418 (finding no deliberate indifference where defendants made a "consistent effort to provide the Plaintiff with medication and treatment to ease the pain and discomfort associated with his arthritis"); Clark v. Doe, 2000 WL 1522855, *2 (E.D.Pa. 2000) ("Courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care").

CMS Defendants, on the other hand, argue that Plaintiff did not receive testing upon his initial request because he did not exhibit HCV risk factors.  In addition, CMS Defendants contend that Plaintiff received more than adequate medical care for treatment of his HCV infection once he tested positive for the disease.  The Court agrees.

To begin, the Court notes that Plaintiff's voluminous medical records suggest that he has received significant care since he has been incarcerated.  Indeed, the record demonstrates that Plaintiff has made numerous sick call visits and received various tests and medication, all of which indicate that Plaintiff has received and continuous to receive quite extensive medical treatment while in custody at SWSP.  See generally Chewning Aff., Ex. C.  Moreover, although Plaintiff was denied his initial requests for HCV testing on August 30, 2002,[8] he was scheduled for testing on October 17, 2002.  Id.  Indeed, the only reason that Plaintiff's HCV test was delayed until December 3, 2002 was because Plaintiff continuously failed to show up for scheduled appointments.  Id.  In addition, once Plaintiff's HCV test came back positive, CMS Defendants promptly enrolled Plaintiff in its chronic care program and began testing and monitoring Plaintiff's HCV infection.  Id.  Moreover, the medical records indicate that any lapses in the testing and treatment of Plaintiff's HCV infection may be attributed to Plaintiff himself as he was a "no show" for numerous scheduled appointments with CMS personnel.  Id.

Further, despite Plaintiff's allegations that there was an unjustified delay in the scheduling of his liver biopsy, nowhere in the Complaint does Plaintiff allege that such a delay

---

[8]     The Court notes that CMS Defendants were made aware of Plaintiff's history with intravenous drugs several times.  In addition, the Court is unclear to what exactly the "risk factors" for HCV are and whether a prolonged history of intravenous drug use is one of the criteria used to evaluate candidacy for mandatory HCV testing.

was due to non-medical reasons or that the delay caused irreparable harm to his medical

condition.  See Durmer, 991 F.2d at 68-69 (holding that if inadequate care was a result of an

error in medical judgment, an inmate's claim must fail; however, if the failure to provide

adequate care was deliberate, and motivated by non-medical factors, then an inmate has a viable

claim); Lanzaro, 834 F.2d at 346 (holding that "where denial or delay causes an inmate to suffer

a life-long handicap or permanent loss, the medical need is considered serious").  In fact, not only

do Plaintiff's medical records indicate that he underwent extensive testing and visited numerous

specialists to determine whether he was eligible for a liver biopsy and HCV drug therapy, the

records also show Plaintiff's HCV infection was in its early stages.  Chewning Aff., Ex. C.

Moreover, Plaintiff was responsible for further delays when he refused gastroenterologist

evaluations on two separate occasions.  Id.  For these reasons, Plaintiff has not established an

issue of material fact regarding whether the CMS Defendants displayed deliberate indifference in

the testing and treatment of Plaintiff's HCV.

In addition, the Court finds that Plaintiff's allegations that he did not receive any sort of

information regarding possible HCV treatment are contradicted by his medical records which

indicate instances where he did, in fact, receive educational materials detailing the side effects,

outcomes, and lengths of HCV drug therapy.  Id.  For example, on April 9, 2003, Plaintiff

received education regarding the length of therapy for HCV, possible side effects, and expected

outcomes.  Id.  On May 27, 2004, Plaintiff stated that he understood how to prevent the

transmission of HCV, the evaluation process for HCV medication treatment, and the risks and

benefits of a liver biopsy.  Id.  CMS Defendants contend that Plaintiff's diagnosis, treatment, and

evaluation of Plaintiff's HCV was consistent with the Guidelines set forth by the Federal Bureau

19

of Prisons ("FBOP Guidelines").[9]  The medical records also indicate numerous instances where

CMS Defendants made decisions based on "sound medical judgments" concerning Plaintiff's

treatment, specifically the discontinuing of Plaintiff's drug therapy after his heart attack.

Chewning Aff., Ex. C.  In the absence of evidence to the contrary, there is no material factual

dispute concerning CMS' alleged Eight Amendment violations.  Therefore, I will grant CMS'

motion for summary judgment on Plaintiff's constitutional claims.


**D. Plaintiff's Medical Malpractice and Negligence Claims against CMS Defendants**

In addition to his constitutional claims, Plaintiff sets forth claims for medical malpractice

and negligence on the part of CMS.  In order to succeed in a medical malpractice suit, a plaintiff

is required to show: (1) the applicable duty of care; (2) a deviation from this standard of care; (3)

injury; and (4) proximate causation between the breach and the injury.  Jackson v. Fauver, 334

F.Supp. 2d 697, 743 (D.N.J. 2004).  To set forth the applicable standard of care in a typical

malpractice case, courts have required the duty of care " [to] be established by expert testimony."

Rosenberg v. Cahill, 99 N.J. 318, 325 (1985).   However, before this Court can examine the

merits of Plaintiff's medical malpractice and negligence claims, I must decide whether these

claims are barred due to Plaintiff's failure to submit an affidavit of merit pursuant to N.J. Stat.

Ann. § 2A:53A-27.  CMS Defendants have moved for summary judgment, arguing that

Plaintiff's failure to submit an affidavit of merit pursuant to N.J. Stat. Ann. 2A:53A-27 is fatal to

his common law claims for negligence, medical malpractice, and emotional distress.

---

[9]      See Chewning Aff., Ex. C, Hepatitis C Guidelines.  This Court has recognized FBOP Guidelines
as consistent with the community standard of care.  See Christy, 216 F.Supp. 2d at 404 (finding FBOP
guidelines concerning the treatment of HCV were consistent with the community standard of care).

In an effort to "weed out frivolous lawsuits early in the litigation," New Jersey's Affidavit of Merit Statute provides:

> In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

N.J. Stat. Ann. § 2A:53A-27.

Indeed, a failure to comply with NJ. Stat. Ann § 2A:53A-27, absent a showing of extraordinary circumstances, "shall be deemed a failure to state a cause of action." § 2A:53A-29; Cornblatt v. Barow, 153 N.J. 218, 247 (1998) ("[a]bsent extraordinary circumstances, a failure to comply with the statute … requires … dismissal … with prejudice."). Moreover, a plaintiff's status as a pro se litigant does not excuse any failure to comply with the Affidavit of Merit Statute. See, e.g., Lee v. Thompson, 163 Fed. Appx. 142, 144 (3d Cir. 2006); Taylor v. Plousis, 101 F.Supp. 2d 255, 270 (D.N.J. 2000); see also Hyman Zamft and Manard v. Cornell, 309 N.J. Super. 586, (1999) ("ignorance of the law or failure to seek legal advice will not excuse failure to meet the filing deadline.").

However, an affidavit of merit is not required where "the jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts," Estate of Chin v. Saint Barnabas Med. Ctr., 160 N.J. 454, 469 (1999). Indeed, under the

21

common knowledge exception, "the jury itself is allowed to supply the applicable standard of

care and thus to obviate the necessity for expert testimony relative thereto." Rosenberg, 99 N.J.

at 325.  "In other words, because the issue is not 'peculiarly within the knowledge of a medical

… practitioner,' the case is treated as an ordinary negligence action in which a jury can determine

without the aid of experts whether a defendant acted with reasonable care." Palanque v. Lambert-

Woolley, 168 N.J. 398, 406 (quoting Estate of Chin, 160 N.J. at 469).   To determine whether the

common knowledge exception applies, "the threshold of merit should be readily apparent from a

reading of the plaintiff's complaint … [and] an expert is no more qualified to attest to the merits

of a plaintiff's claim than a non-expert." Natale, 318 F.3d at 580 (quoting Hubbard v. Reed, 168

N.J. 387, 394 (2001)).

        In the instant matter, Defendants filed their Answers on June 8, 2005, thus Plaintiff would

have had 120 days at the most – or, until October 8, 2005 –  to file an affidavit of merit.  As of

today, nearly 10 months after the deadline to file an affidavit of merit has passed, Plaintiff has

not filed an affidavit of merit.  Indeed, this Court is not aware of any attempt by Plaintiff to retain

an expert in an effort to comply with N.J. Stat. Ann. § 2A:53A-27.  Moreover, Plaintiff never

asked this Court for an extension of time within which to file an affidavit of merit nor has he

presented any extraordinary circumstances that could have delayed his ability to file beyond the

allotted time.

        Further, the Court notes that the common knowledge doctrine generally does not apply in

instances where a plaintiff alleges the defendant failed to properly screen for, diagnose, and treat

a medical condition.  See Lopez v. CMS, 2006 WL 1722584, at *4 (D.N.J. 2006) (finding a

reasonable layperson would not be able to determine whether a defendant was negligent in failing

to properly screen for and diagnose his HCV infection). "Where a plaintiff lacks the ability to explain the medical consequences of a certain course of treatment, expert medical testimony is needed to prove a claim based on a resulting medical injury." Id. at *5.  However, an affidavit of merit has not been required where the defendants failed to inform the prisoner of his diagnosed medical condition.  See id. at *4.

In the instant matter, Plaintiff alleges that CMS Defendants did not properly screen or treat him for HCV and that they failed to monitor and test his medical condition.  Compl. at ¶ 44.  Thus, as above, the common knowledge exception is not applicable.  See Lopez, 2006 WL 1722584 at *4.  Indeed, this Court questions the ability of a layperson to be aware of the correlation between HCV risk factors and the need for HCV testing.  Rather, as in Lopez,  special expertise or expert testimony would be necessary to set forth the pertinent risk factors and criteria used to determine who is at risk of HCV infection, what HCV drug therapy or alternative treatment options would be appropriate for a certain patient, and whether CMS Defendants properly analyzed medical tests performed on the patient.  Thus, Plaintiff's claims of medical malpractice and negligence do not fall within the common knowledge exception and Plaintiff's failure to file an affidavit of merit is fatal to his claims against CMS.

E.      **Plaintiff's Emotional Distress Claims against CMS Defendants**

Finally, Plaintiff asserts intentional and negligent infliction of emotional distress claims against CMS Defendants arising out of his medical malpractice and negligence claims. CMS Defendants argue that Plaintiff's failure to comply with the Affidavit of Merit Statute proves fatal to Plaintiff's emotional distress claims. The Court agrees.

In determining whether the Affidavit of Merit Statute applies to a claim, the New Jersey Supreme Court has looked to whether "the claim's underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession." Couri v. Gardner, 173 N.J. 328, 340 (2002); see also Risko v. Ciocca, 356 N.J. Super. 406, 412 (App. Div. 2003) (finding plaintiff's fraud claims must be dismissed when they "essentially deal[t] with a claimed deviation in the standard of care"). In the instant matter, Plaintiff's emotional distress claims rely solely on the factual allegations set forth in his medical malpractice and negligence claims. For Plaintiff to prove his emotional distress claims, he would have to present expert testimony establishing that CMS Defendants deviated from the professional standard of care and that deviation in treatment of Plaintiff's HCV infection resulted in his emotional distress. Accordingly, because Plaintiff failed to provide an affidavit of merit pursuant to N.J. Stat. Ann. §2A:53A-27 and Plaintiff's emotional distress claims require expert testimony to set forth the applicable professional standard of care, Plaintiff's emotional distress claims must be dismissed with prejudice.

III.    **CONCLUSION**

For the reasons set forth above, Plaintiff's Application for Pro Bono Counsel is denied. Moreover, Plaintiff's § 1983 claim against Brown in his official capacity is barred by Eleventh

Amendment sovereign immunity.  Furthermore, Plaintiff's failure to present a question of material fact regarding Brown's personal involvement in his medical treatment is fatal to his § 1983 claim against Brown in his individual capacity.  Thus, Brown's Motion for Summary Judgment is granted.

In addition, Plaintiff's failure to raise a dispute of material fact as to CMS Defendants' diagnosis, treatment, and testing of Plaintiff's HCV infection is fatal to his Plaintiff's § 1983 claim against CMS Defendants.  Accordingly, CMS Defendants' Motion for Summary Judgment on Plaintiff's § 1983 claim is granted.  Furthermore, Plaintiff's medical malpractice, negligence and emotional distress claims are dismissed with prejudice because Plaintiff failed to comply with the Affidavit of Merit Statute.  An appropriate Order shall follow.


Date: August 15, 2006                                   /s/ Freda L.Wolfson
                                                        United States District Judge